RECEIVED
SDNY DOCKET UNIT

2018 SEP 20  PM 4: 03

RECEIVED
SDNY DOCKET UNIT

2018 SEP 10  PM 3: 47

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN P. CARTWRIGHT<br><br>Plaintiff,<br><br>v.<br><br>DOMINICK D'ALLEVA,<br>PHILIP A. EPSTEIN,<br>LANCE PETERSON,<br>JAMES A. WATT,<br>GSO CAPITAL PARTNERS,<br>MARCUS C. ROWLAND,<br>BANK OF MONTREAL,<br>BMO CAPITAL MARKETS,<br>JEFFERIES LLC,<br><br>Defendants. | Civil Action No. 1:17-CV-05953 |

## NOTICE OF APPEAL

Notice is hereby given that Morgan P. Cartwright, Plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Order granting Defendant's Motion to Dismiss and Judgment entered in this action on August 27, 2018.

DATED this 7th of September 2017.

//

```
Court Name: District Court
Division: 1
Receipt Number: 465401218864
Cashier ID: Jgoldber
Transaction Date: 09/21/2018
Payer Name: MORGAN P CARTWRIGHT
------------------------------------
NOTICE OF APPEAL/DOCKETING FEE
 For: MORGAN P CARTWRIGHT
 Amount:      $505.00
------------------------------------
CHECK
 Check/Money Order Num: 3458
 Amt Tendered: $505.00
------------------------------------
Total Due:    $505.00
Total Tendered: $505.00
Change Amt:    $0.00

17CV005953
```

1

2

3

_____

4   Morgan Cartwright
    2347 North 179th Street
5   Shoreline, WA 98133
    Tel: (206)334-5470
6   morganphilipcartwright@gmail.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1
2
3

**CERTIFICATE OF SERVICE**

4        I HEREBY CERTIFY that a true and accurate copy of the foregoing NOTICE OF

5    APPEAL was served by mailing a copy to counsels of record (Douglas Henkin and Danny

6    David) on September 7, 2018, sending a copy to Pro Se Intake Unit to be filed by CM/ECF on

7    September 10, 2018, and emailing a copy to counsels designated email on December 10, 2017.

8
9
10    _____

11                    Morgan Cartwright
                      2347 North 179th Street
12                    Shoreline, WA 98133
                      Tel: (206)334-5470
13                    morganphilipcartwright@gmail.com

14
15
16
17
18
19
20
21
22
23
24
25
26

NOTICE OF APPEAL            3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

MORGAN P. CARTWRIGHT,

Plaintiff,

-against-

DOMINICK D'ALLEVA, PHILIP A.
EPSTEIN, LANCE PETERSON, JAMES A.
WATT, GSO CAPITAL PARTNERS,
MARCUS C. ROWLAND, BANK OF
MONTREAL, BMO CAPITAL MARKETS, and
JEFFRIES LLC,

Defendants.

-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  8|27|18
```

17 **CIVIL** 5953 (AT)(KHP)

## **JUDGMENT**

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Order dated August 27, 2018, the Moving Defendants' motion to dismiss is

GRANTED, and their motion for sanctions is DENIED; accordingly, the case is closed.

**Dated:** New York, New York
August 27, 2018

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:**

Kmango

**Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN P. CARTWRIGHT, | |
| Plaintiff, | |
| -against- | |
| DOMINICK D'ALLEVA, PHILIP A. EPSTEIN, LANCE PETERSON, JAMES A. WATT, GSO CAPITAL PARTNERS, MARCUS C. ROWLAND, BANK OF MONTREAL, BMO CAPITAL MARKETS, and JEFFERIES LLC, | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/27/2018

17 Civ. 5953 (AT) (KHP)

**ORDER**

ANALISA TORRES, United States District Judge:

Plaintiff *pro se*, Morgan P. Cartwright, a shareholder of Warren Resources, Inc.

("Warren"), brings this action against Defendants, Dominick D'Alleva, Phillip A. Epstein, Lance

Peterson, James A. Watt, GSO Capital Partners ("GSO"), Marcus C. Rowland, Bank of Montreal

("BMO"), BMO Capital Markets ("BMO Capital"), and Jefferies LLC ("Jefferies"), alleging that

Defendants engaged in a scheme to defraud Warren's shareholders by misrepresenting the

company's assets and financial strength, ultimately leading to its bankruptcy.  D'Alleva, Epstein,

Peterson, Watt, and GSO[1] (the "Moving Defendants") move to dismiss the Amended Complaint

under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and move for sanctions against

Plaintiff under the Private Securities Litigation Reform Act ("PSLRA").  ECF No. 24.  For the

reasons stated below, the motion to dismiss is GRANTED and the motion for sanctions is

DENIED.

---

[1] The remaining Defendants—Rowland, BMO, BMO Capital, and Jefferies—have not been served with process and, therefore, have yet to appear in this action.

## BACKGROUND

Warren is an oil and gas company incorporated in Maryland.  Am. Compl. ¶¶ 1, 104, ECF No. 18.  D'Alleva, Epstein, Peterson, Watt, and Rowland (collectively, the "Individual Defendants") were members of Warren's board of directors (the "Board") during the time period relevant to their allegedly fraudulent conduct.  *Id.* ¶¶ 26–29, 31.  Epstein was Warren's CEO and Chairman of the Board from December 2012 through December 2014; D'Alleva has been Chairman of the Board since December 2014; Peterson joined the Board in August 2014, and was Interim CEO from December 2014 through November 2015; Watt has been CEO and President of Warren and has served on the Board since November 2015; and Rowland has served on the Board, though Plaintiff does not specify when.  *Id.*

On July 7, 2014, Warren announced that it had executed an agreement to buy land in the Marcellus Shale gas region in Pennsylvania from Citrus Energy Corp. ("Citrus") for $352.5 million (the "Citrus Deal").  *Id.* ¶ 46.  As part of the purchase, Peterson, who was then the President and CEO of Citrus, joined the Warren Board.  *Id.*  Warren financed the purchase with a $300 million bond offering (the "Bond Offering").  *Id.* ¶ 48.  BMO Capital financed $210 million of the Bond Offering, and Jefferies financed $22.5 million.  *Id.* ¶¶ 48–49.  BMO Capital also provided Warren with a $250 million "senior unsecured bridge loan."  *Id.* ¶ 50.

Plaintiff alleges that although Defendants publicly represented that they acquired 20,000 acres of land in the Citrus Deal, they actually acquired only 6,932 acres.  *Id.* ¶¶ 51–55.  In support of this allegation, Plaintiff cites an August 6, 2014 Purchase Agreement (the "Agreement"), a document setting forth the terms of the Bond Offering that was signed by Epstein in his capacity as Warren's CEO.  The Agreement states that Warren had acquired "essentially all of the Marcellus assets of Citrus," and that the "total developed net acreage

2

position is changed from 25,504 to 23,504." Agreement, at 1–2, 38, ECF No. 31; *see also* Am. Compl. ¶¶ 51–52. Plaintiff also alleges that prior to Warren's purchase, Citrus's website stated that it owned 26,500 acres of land in the Marcellus Shale region. Am. Compl. ¶ 53.

The natural gas market experienced considerable volatility in the months following the announcement of the Citrus Deal. *Id.* ¶¶ 58–59, 61. Plaintiff alleges that despite the instability in the market, Defendants made several public statements touting Warren's financial strength and stability. For example, in a November 4, 2014 press release announcing Warren's third quarter financial results, Epstein stated that "Warren has over $100 million in liquidity" and that it "is well positioned to ride-out market fluctuations while maintaining financial flexibility to execute on attractive growth opportunities." *Id.* ¶ 63. Plaintiff contends that these statements were misleading because Warren had only "$1.8 million in cash and cash equivalents, and had already tapped $120.7 million of its $225 million credit facility." *Id.* ¶ 64.

Similarly, in a March 11, 2015 press release announcing Warren's financial results from the fourth quarter of 2014, Peterson, who had since taken over as Interim CEO, stated that "[w]hile there has been significant volatility in commodity prices and the capital markets recently, Warren has an asset base well positioned to successfully navigate the current market environment." *Id.* ¶ 72 (alteration in original). Warren's press releases announcing its financial results from the first and second quarters of 2015 contained similar representations about its ability to withstand volatility in the market. *Id.* ¶¶ 77, 82. Plaintiff contends, however, that "[b]y the end of June 2015, Warren was still bleeding cash. Peterson knew that the Company was burning through its cash and teetering on the verge of insolvency, yet continued to make false statements." *Id.* ¶ 80.

In June 2015, Warren announced that it had agreed to sell a portion of its operations in

Wyoming County, Pennsylvania to Escalera Resources ("Escalera") for $47 million (the "Escalera Deal").  *Id.* ¶ 79.  In an August 2015 telephone call with investors, Peterson stated that "everything is going very smoothly with [the Escalera Deal]," even though, according to Plaintiff, he "knew that Escalera was facing financial troubles."  *Id.* ¶ 83.

On November 3, 2015, Moody's Investor Services downgraded Warren's credit rating. *Id.* ¶ 90.  In a November 9, 2015 press release announcing Warren's third quarter financial results, the company stated that the Escalera Deal had fallen apart.  *Id.* ¶ 91.  According to Plaintiff, Warren was "counting on" the deal "to reduce its growing debt."  *Id.*  On an investor call that same day, Peterson assured investors that "we do not anticipate needing any additional liquidity before the third quarter of 2016 if not beyond."  *Id.* ¶ 92.

On February 1, 2016, Watt, who had replaced Peterson as CEO, announced that Warren had decided not to make interest payments due on certain senior notes.  *Id.* ¶ 99.  He explained that the decision was "strategic," and that "our substantial cash position allows us to continue to meet all of our obligations . . . and to continue to fund our operations."  *Id.*  Eight days later, however, Watt stated that "[t]hese are difficult times for Warren and its industry peers . . . .  [W]e must seek further concessions from our various debt holders and vendors to survive what is anticipated to be a lengthy downturn in commodity prices."  *Id.* ¶ 100.

Plaintiff alleges that, in reliance on the Individual Defendants' public statements assuring investors of Warren's financial strength and stability, between October 2014 and January 2016 he purchased 148,383 shares of Warren common stock for $60,222.16.  *Id.* ¶¶ 60, 67, 73–74, 85–87, 95–98, 107.

On June 2, 2016, Warren filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  *Id.* ¶ 103.  GSO was the

"Plan Sponsor" in the bankruptcy proceedings, and Jefferies was Warren's investment banker and financial advisor. *Id.* ¶ 106. On September 14, 2016, the Bankruptcy Court issued an order (the "Bankruptcy Court Order") approving Warren's Chapter 11 reorganization plan (the "Plan"), over an objection filed by Plaintiff. Henkin Decl. Ex. D, ECF No. 26-1.

Plaintiff claims that each of the nine Defendants profited from their alleged fraud. Starting with the Individual Defendants, Plaintiff alleges that Peterson obtained a $40 million tax write-off from his shares of Warren stock and a $50 million profit from the Citrus Deal; that D'Alleva, Epstein, and Rowland received millions of dollars in compensation; and that Watt retained his position as CEO of Warren after the bankruptcy and that he "may receive" up to 5% of Warren's common stock. Am. Compl. ¶¶ 108–110. As for GSO, BMO, BMO Capital, and Jefferies (the "Institutional Defendants"), he alleges that GSO retained an 80% ownership stake in Warren after the bankruptcy; that BMO and BMO Capital received several million dollars in interest payments; and that Jefferies received millions of dollars in interest payments and advisory fees. *Id.* ¶¶ 111–113.

## DISCUSSION

I.    Motion to Dismiss

      A.  Legal Standards

           1.  Rule 12(b)(1)

The Moving Defendants move to dismiss Counts Five through Eight of the Amended Complaint on the grounds that, *inter alia*, Plaintiff lacks standing. *See* Def. Mem. at 26–28, ECF No. 25. A motion to dismiss for lack of standing is a challenge to the Court's subject matter jurisdiction and, therefore, arises under Federal Rule of Civil Procedure 12(b)(1). *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016). To survive a motion to dismiss

for lack of standing under Rule 12(b)(1), a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). In resolving a Rule 12(b)(1) motion, "a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). Still, the Court must make all reasonable factual inferences in the non-moving party's favor. *Amidax Trading Grp.*, 671 F.3d at 145. Because Plaintiff is proceeding *pro se*, the Court must read the pleadings to raise the strongest possible claims that they suggest. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006).

### 2. Rule 12(b)(6)

Defendants move to dismiss all ten counts of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations," but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). As with Defendants' Rule 12(b)(1) motion, because Plaintiff is proceeding *pro se*, the Court is obligated to read Plaintiff's pleadings to raise the

strongest possible claims that they suggest.  *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

### 3.   Heightened Pleading Standards: Counts One Through Four

Counts One and Two of the Amended Complaint allege securities fraud in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), Am. Compl. ¶¶ 128–38, and Counts Three and Four allege common law fraud, *id.* ¶¶ 139–50.  Because all four counts allege fraud, they are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns*, 493 F.3d at 99; *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 752 (S.D.N.Y. 2018).  Under Rule 9(b), a complaint must "state the circumstances constituting fraud . . . with particularity."  Fed. R. Civ. P. 9(b).

In addition to satisfying Rule 9(b), Plaintiff's claims under the Exchange Act—Counts One and Two—must meet the heightened pleading standards of the PSLRA.  *ATSI Commc'ns*, 493 F.3d at 99.  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)).  Where, as here, a plaintiff alleges a false statement or omission, the complaint must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

### B.   Analysis

#### 1.   Count One: Section 10(b) of the Exchange Act and SEC Rule 10b–5

Count One of the Amended Complaint alleges that the Individual Defendants violated § 10(b) of the Exchange Act and SEC Rule 10b–5.  Am Compl. ¶¶ 128–132.  To state a claim of

securities fraud under § 10(b) and Rule 10b–5, a plaintiff must allege facts showing that "the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)). To establish a false statement or omission under Rule 9(b) and the PSLRA's heightened pleading standards, a complaint must "(1) specify the statements that the plaintiff alleges were fraudulent, (2) identify the speaker, (3) indicate when and where the statements were made, and (4) explain why the statements were fraudulent." *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 119 (S.D.N.Y. 2013) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

Plaintiff alleges two categories of false statements made by the Individual Defendants. First, he claims that the Individual Defendants stated that Warren purchased 20,000 acres in the Citrus Deal, when in fact it only purchased 6,932 acres. Pl. Opp. at 10–11, ECF No. 30. Second, he alleges that between November 2014 and February 2016, the Individual Defendants made a number of statements touting Warren's financial strength and its ability to survive volatility in the natural gas market that "had no basis in fact." *Id.* at 11–13. Even under the less stringent pleading standards applied to *pro se* plaintiffs, none of these alleged statements establish a securities fraud violation under § 10(b) or Rule 10b–5.

### a. Statements Concerning the Citrus Deal

The Individual Defendants' statements concerning the Citrus Deal do not give rise to a securities fraud claim because Plaintiff has failed to allege that any of the statements were in fact false or misleading. Plaintiff cites two statements in the Agreement: first, that "[t]he total developed net acreage position is changed from 25,504 to 23,504"; and second, that Warren

acquired "essentially all of the Marcellus Assets of Citrus" in the Citrus Deal.  Am. Compl. ¶¶
52, 54; Agreement, at 1–2, 38.  Plaintiff also cites a statement on Citrus's website that Citrus
owned 26,500 acres of land in the Marcellus Shale region prior to the Citrus Deal.  Am. Compl. ¶
53; Cartwright Decl. Ex. C, ECF No. 31.

   None of these statements, to the extent they can be attributed to the Individual
Defendants, misrepresent the number of acres purchased in the Citrus Deal.  Beginning with the
statement on Citrus's website, Plaintiff does not identify any of the Individual Defendants as the
speaker of that statement.  Even if he did, the statement appears to have been made in 2010, four
years before the Citrus Deal.  *See* Cartwright Decl. Ex. C ("[Citrus] is actively developing
acreage . . . in the Marcellus Shale . . . .  [Citrus] currently holds interest in 26,500 acres . . . .
The company *plans to* drill 20 wells in 2011-2012." (emphasis added)).  It is, therefore, entirely
possible that Citrus owned 26,500 acres of land in the Marcellus region in 2010, but not in 2014,
when the Citrus Deal was consummated.

   Turning to the statements in the Agreement, there is no indication that the statement
concerning the change in "developed net acreage position" refers to the number of acres acquired
in the Citrus Deal.  Rather, it is contained in a section of the Agreement setting forth general
financial information about Warren, *see* Agreement, at 37–39, and, therefore, appears to refer to
the total number of developed acres owned by Warren.[2]  As for the statement that the Citrus Deal
involved acquisition of "essentially all" of Citrus's Marcellus Shale assets, this statement is not

---

[2] The Moving Defendants attach a document to their motion to dismiss which purportedly corroborates
that the statement concerning "developed net acreage position" refers to Warren's total holdings, not the
amount of land acquired in the Citrus Deal.  *See* Henkin Decl. Ex. Z, ECF No. 33-4.  Because this
document is not incorporated by reference, integral to, or attached to the Amended Complaint, however,
the Court cannot consider it on this motion to dismiss.  *See McNaughton v. De Blasio*, No. 14 Civ. 221,
2015 WL 468890, at *4 (S.D.N.Y. Feb. 4, 2015).

inconsistent with the acquisition of 6,932 acres—the actual amount of land allegedly acquired in the deal—because Plaintiff has failed to allege that any of the Individual Defendants stated that Citrus owned 20,000 acres in the Marcellus Shale at the time of the deal.  Plaintiff has, therefore, failed to allege that any of the Individual Defendants misrepresented or made a false statement about the number of acres of land that Warren purchased in the Citrus Deal.

b.   Statements Concerning Warren's Financial Position

Plaintiff has also failed to allege that the Individual Defendants' statements concerning Warren's financial position amount to securities fraud.  The relevant statements include Epstein's November 4, 2014 statement that Warren "is well-positioned to ride-out market fluctuations while maintaining financial flexibility," Am. Compl. ¶ 63; Peterson's March 11, 2015 statement that "[w]hile there has been significant volatility in commodity prices and the capital markets recently, Warren has an asset base well positioned to successfully navigate the current market environment," *id.* ¶ 72; Peterson's August 2015 statement that due diligence on the Escalera Deal was going "very smoothly" when he allegedly knew it was not, *id.* ¶ 83; and Watt's February 1, 2016 statement that the decision to not make certain interest payments was "strategic," and that "our substantial cash position allows us to continue to meet our obligations . . . and to fund our operations," *id.* ¶ 99.[3]

As an initial matter, Plaintiff argues that the "falsity" of these statements "link[s] back to the first misstatement during the [Citrus Deal]."  Pl. Opp. at 10.  As already discussed, however,

---

[3] Plaintiff challenges other similar statements by the Individual Defendants.  *See, e.g.*, Am. Compl. ¶ 65 (December 5, 2014 statement by Epstein that "Warren is a strong company and strategically positioned in the market"); *id.* ¶¶ 77, 80 (May 7, 2015 statement by Peterson that "Warren has responded to a volatile commodity market environment and has taken action to position the Company to weather these challenging times," even though he purportedly "knew that the Company was teetering on the edge of insolvency"); *id.* ¶ 92 (November 9, 2015 statement by Peterson that "we do not anticipate needing any additional liquidity before the third quarter of 2016 if not beyond"); *see also* Pl. Opp. at 11–12.

the Individual Defendants never misrepresented the number of acres they acquired in the Citrus Deal.  Plaintiff's assertion that the Individual Defendants' statements concerning Warren's financial position are false, therefore, relies on an incorrect premise.  Plaintiff otherwise makes only vague and conclusory allegations that Warren paid above-market value in the Citrus Deal and that the Individual Defendants "knew that the acquisition left Warren in a disastrous position."  Pl. Opp. at 12; Am. Compl. ¶ 54.  Plaintiff has, therefore, failed to allege that the Individual Defendants' statements about Warren's financial position were false or fraudulent.

To the extent that the Individual Defendants' statements obscured Warren's financial vulnerability based on volatility in the natural gas market, the statements are too general in nature to establish that a reasonable investor could rely on them in making investment decisions. In *Lasker v. N.Y.S. Elec. & Gas Corp.*, the Second Circuit held that a company's statements to investors that it would not "compromise its financial integrity" and that its "business strategies [would] lead to continued prosperity" did not give rise to securities violations because they constitute "puffery."  85 F.3d 55, 59 (2d Cir. 1996).  The Second Circuit explained that these statements could not trigger liability under § 10(b) or Rule 10b–5 because "[a] reasonable investor would not believe that, by merely making the broad, general statements cited in this complaint, [the defendant] had insured against the risks inherent in diversification."  *Id.*; *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 198, 205–06 (2d Cir. 2009) (holding that company's statement that its "risk management processes [] are highly disciplined and designed to preserve the integrity of the risk management process," along with other similar statements, are "too general to cause a reasonable investor to rely on them," as they do "not[] amount to a guarantee that its choices would prevent failures in its risk management practices" (internal quotation marks omitted)).

*Lasker* applies with equal force in this case.  The statements challenged by Plaintiff are each broad, general statements about Warren's ability to navigate volatility in the natural gas market and meet its financial obligations.  *See, e.g.*, Am. Compl. ¶ 72 (March 11, 2015 statement by Peterson that "[w]hile there has been significant volatility in commodity prices and the capital markets recently, Warren has an asset base well positioned to successfully navigate the current market environment").[4]  Under *Lasker*, therefore, it would be unreasonable for Plaintiff to rely on those statements for the proposition that Warren did in fact have the ability to withstand volatility in the natural gas market or meet its financial obligations.  Thus, in addition to failing to plead with particularity that the Individual Defendants' statements concerning Warren's financial position are false, Plaintiff has also failed to plead facts sufficient to satisfy the reliance prong of a securities fraud claim.

The Amended Complaint, therefore, fails to state a claim for violation of § 10(b) of the Exchange Act or SEC Rule 10b–5.  Accordingly, the Moving Defendants' motion to dismiss Count One of the Amended Complaint is GRANTED.

### 2.   Count Two: Section 20(a) of the Exchange Act

Count Two of the Amended Complaint alleges controlling person liability under § 20(a) of the Exchange Act.  Am. Compl. ¶¶ 133–38.  "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant."  *SEC v. First Jersey Sec., Inc.*, 101

---

[4] The only specific factual assertion that Plaintiff challenges in the Amended Complaint is Epstein's November 4, 2014 statement that "Warren has over $100 million in liquidity."  Am. Compl. ¶ 63. However, because Plaintiff also alleges that, at that time, Warren had only tapped $120.7 million of a $225 million credit facility, *id.* ¶ 64, Epstein's statement concerning Warren's liquidity appears to be truthful.

F.3d 1450, 1472 (2d Cir. 1996).  That is, Plaintiff cannot maintain a claim under § 20(a) because

he has failed to state a claim under § 10(b) and Rule 10b–5.  *See Rombach v. Chang*, 355 F.3d

164, 178 (2d Cir. 2004) ("Because we have already determined that the district court properly

dismissed the primary securities claims against the individual defendants, these secondary claims

must also be dismissed.").  Accordingly, the Moving Defendants' motion to dismiss Count Two

of the Amended Complaint is GRANTED.

### 3.   Counts Three and Four: Common Law Fraud

Counts Three and Four of the Amended Complaint allege "Intentional

Misrepresentation/Fraud" and "Fraudulent Concealment," respectively, against the Individual

Defendants.  Am. Compl. ¶¶ 139–150.  Although the PSLRA's heightened pleading standards do

not apply to these claims, Rule 9(b)'s particularity pleading standard does.  *See Hammerstone*

*NV, Inc. v. Hoffman*, No. 09 Civ. 2685, 2010 WL 882887, at *11 (S.D.N.Y. Mar 10, 2010).

Plaintiff's fraud claims, therefore, "essentially track [his] Section 10(b) claims."  *Id.* (quoting

*Liberty Media Corp. v. Vivendi Universal, S.A. (In reVivendi Universal, S.A. Sec. Litig.)*, Nos. 02

Civ. 5571, 03 Civ. 2175, 2004 WL 876050, at *11 (S.D.N.Y. Apr. 22, 2004)).  Because the Court

has concluded that Plaintiff failed to allege that the Individual Defendants fraudulently

misrepresented or concealed material facts in connection with his § 10(b) claims, Plaintiff's

allegations do not satisfy Rule 9(b).  Accordingly, the Moving Defendants' motion to dismiss

Counts Three and Four of the Amended Complaint is GRANTED.

### 4.   Counts Five Through Eight: Breach of Fiduciary Duty

In Counts Five through Eight of the Amended Complaint, Plaintiff alleges that the

Individual Defendants breached the fiduciary duties of care, candor, good faith and fair dealing,

and maximization of shareholder value, respectively.  Am. Compl. ¶¶ 151–166.  The Court

13

concludes that Plaintiff does not have standing to bring these claims, and that even if he did, he has failed to state a claim for breach of any fiduciary duty.

a.   Standing

Warren was a Maryland corporation at the time of the events alleged in the Amended Complaint.  *Id.* ¶ 104; *see* Henkin Decl. Ex. S, ECF No. 26-3.  Maryland substantive law, therefore, applies to Plaintiff's breach of fiduciary duty claims.  *See, e.g.*, *Schentag v. Nebgen*, No. 17 Civ. 8734, 2018 WL 3104092, at *21 (S.D.N.Y. June 21, 2018) ("Under New York law, the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation.").

Like other jurisdictions, Maryland distinguishes between direct and derivative lawsuits brought by shareholders of a corporation.  In a derivative action, "an individual shareholder or group of shareholders [] bring suit to enforce a corporate cause of action against officers, directors, and third parties where those in control of the company refuse to assert a claim belonging to it."  *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 423 (Md. 2009).  By contrast, in a direct action, the shareholder "suffers the harm directly or a duty is owed directly to the shareholder."  *Id.*

An individual shareholder generally lacks standing to bring a derivative action.  *See id.* at 422 ("Ordinarily, a shareholder does not have standing to sue to redress an injury to the corporation resulting from directorial mismanagement.").  To have standing to bring a derivative action, a shareholder "either must make a demand on the corporation's board of directors to pursue the claim against the offending parties or demonstrate to the court that such demand would be futile due to the conflicting interests of the members of the board."  *Id.* at 423.  It is undisputed that Plaintiff failed to take either of those steps here.  For Plaintiff to have standing to

14

bring his breach of fiduciary duty claims against the Individual Defendants, the claims must, therefore, be direct claims.

"Whether a claim is direct or derivative depends on (1) 'the nature of the wrong alleged' and (2) the relief that the plaintiff would receive if successful." *Oliveira v. Sugarman*, 152 A.3d 728, 742 (Md. 2017) (quoting *Shenker*, 983 A.2d at 425).[5]  To establish that a claim is direct on the first prong, the shareholder must allege "a 'distinct injury' separate from any harm suffered by the corporation." *Id.*  On the second prong, "[t]he remedy that a shareholder seeks must benefit the shareholder as an individual, not the corporate entity." *Id.*

A typical case in which a shareholder suffers an injury "distinct" from the corporation is one "[w]here the rights attendant to stock ownership are adversely affected," such as an "action[] to enforce a shareholder's right to vote or right to inspect corporate records." *Shenker*, 983 A.2d at 345.  Here, the injury Plaintiff alleges is not to his rights as a shareholder, but rather, the lost value of his shares.  *See* Am. Compl ¶ 107 ("Plaintiff's 148,383 shares (total cost $60,222.16) . . . were wiped out . . . .").  Where a shareholder alleges that his shares lost value because of a corporate director's breach of her fiduciary duties, Maryland courts have permitted the shareholder to bring a direct action in only a limited set of circumstances.  In *Shenker*, Maryland's highest court held that a shareholder could bring a direct action for breach of the fiduciary duties of candor and maximization of shareholder value in the context of a cash-out merger because, in such a merger, directors "assume a different role than solely managing the business and affairs of the corporation," specifically, to "act as fiduciaries on behalf of the

---

[5] Maryland law also governs the analysis of whether Plaintiff's breach of fiduciary duty claims are direct or derivative.  *See AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 698 (2d Cir. 2015) ("Under New York law, we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative.").

shareholders" by "negotiating a share price that shareholders will receive." 983 A.2d at 408.
Courts in Maryland, interpreting *Shenker*, have since held that the right to bring a direct action
against corporate directors for breach of the fiduciary duties of maximization of value and candor
is limited to "when 'the decision is made to sell the corporation,' the 'sale of the corporation is a
foregone conclusion,' or the sale involves 'an inevitable or highly likely change-of-control
situation.'" *Sutton v. FedFirst Fin. Corp.*, 126 A.3d 765, 788 (Md. Ct. Spec. App. 2015)
(quoting *Shenker*, 983 A.2d at 408).

There is no sale at issue in this case, and thus no distinct duty owed to shareholders to
maximize value that is not owed to the corporation. Indeed, the allegations at the heart of the
Amended Complaint concern business decisions and public representations made by the
Individual Defendants that allegedly plunged the *company* into bankruptcy. Plaintiff's breach of
fiduciary duty claims, therefore, do not allege a distinct injury to Plaintiff separate from the harm
suffered by the corporation. Accordingly, Plaintiff lacks standing to bring his breach of fiduciary
duty causes of action against the Individual Defendants as either derivative or direct claims.

### b.  Merits

Even if Plaintiff had standing to bring his breach of fiduciary duty claims, he has not
plausibly alleged that they would succeed on the merits. Under Maryland law, a director has a
fiduciary duty to carry out his or her corporate acts "(1) In good faith; (2) In a manner he [or she]
reasonably believes to be in the best interests of the corporation; and (3) With the care that an
ordinarily prudent person in a like position would use under similar circumstances."
*Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1001 (Md. 2007) (quoting Md. Code, Corps. &
Ass'ns § 2-405.1(c)). Here, for the reasons discussed in connection with Plaintiff's securities
fraud claims, none of his allegations establish a plausible inference that the Individual

Defendants were not acting in good faith or in a manner consistent with the best interests of the corporation.  Rather, the Amended Complaint paints a picture of Warren's decline based primarily on volatility in the natural gas market.  Although the Individual Defendants' may have made statements sugarcoating the company's financial situation, the Court cannot conclude that their alleged conduct was a bad faith use of "their positions to advance their own individual interest as distinguished from that of the corporation."  *Id.* (quoting *Indurated Concrete Corp. v. Abbott*, 74 A.2d 17, 20 (1950)).  Even if Plaintiff had standing to bring his breach of fiduciary duty claims against the Individual Defendants, therefore, his allegations fail to state a claim under Maryland law.  Accordingly, the Moving Defendants' motion to dismiss Counts Five through Eight of the Amended Complaint is GRANTED.

> 5.  Count Nine: Aiding and Abetting Breach of Fiduciary Duty

Count Nine of the Amended Complaint alleges that BMO, BMO Capital, Jefferies, and GSO aided and abetted the Individual Defendants' breach of their fiduciary duties.  Am. Compl. ¶¶ 167–172.  To state a claim for aiding and abetting breach of a fiduciary duty, a plaintiff must allege facts showing "that the aider and abettor knowingly and substantially assisted the principal violation."  *Sutton*, 126 A.3d at 792 (internal quotation marks, alteration, and citation omitted).  Because Plaintiff has failed to allege that any of the Individual Defendants breached their fiduciary duties, Plaintiff cannot state an aiding and abetting claim.  Accordingly, the Moving Defendants' motion to dismiss Count Nine of the Amended Complaint is GRANTED.

> 6.  Count Ten: Civil Conspiracy

Count Ten of the Amended Complaint alleges civil conspiracy against all Defendants.  Am. Compl. ¶¶ 173–179.  Under Maryland law, "civil conspiracy 'is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the

plaintiff.'"  *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005) (quoting *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1044–45 (Md. 1995)).  As discussed above, Plaintiff has failed to state a cause of action with respect to any of the other claims in the Amended Complaint.  Accordingly, in the absence of any other tortious injury to Plaintiff, the Moving Defendants' motion to dismiss Count Ten of the Amended Complaint is GRANTED.

II.  <u>Motion for Sanctions</u>

Defendants also move for sanctions under the PSLRA.  Def. Mem. at 40–42.  The PSLRA requires courts to make a specific finding as to whether sanctions are appropriate under Federal Rule of Civil Procedure 11 "upon final adjudication of the action."  15 U.S.C. § 78u–4(c)(1); *see Hammerstone NV, Inc.*, 2010 WL 882887, at *11.  Outside of the securities litigation context, the decision to award sanctions under Rule 11 generally lies in the sound discretion of the district court.  *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012).  Under the PSLRA, however, a district court must award sanctions where it finds that a party has violated Rule 11.  15 U.S.C. § 78u–4(c)(2); *see Manchester Mgmt. Co. v. Echo Therapeutics, Inc.*, 297 F. Supp. 3d 451, 463 (S.D.N.Y. 2018).  In considering whether to award sanctions against a *pro se* litigant, the Court should consider the "special circumstances of litigants who are untutored in the law."  *Murawski v. Pataki*, 514 F. Supp. 2d 577, 590 (S.D.N.Y. 2007) (quotation marks and citation omitted)

The Court concludes that Plaintiff has not violated Rule 11.  First, Defendants argue that Plaintiff violated Rule 11(b)(1)—which prohibits bringing an action for "any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," Fed. R. Civ. P. 11(b)(1)—by bringing this action to collaterally attack the Bankruptcy Court Order. Defendants make only a cursory argument, however, that this action is barred by collateral

estoppel, failing to cite a single case in which a securities fraud action is barred by a prior bankruptcy court order. *See* Def. Mem. at 37–39. The Court, therefore, concludes that an intent to harass, delay, or increase litigation costs cannot be inferred from Plaintiff's filing of this lawsuit because Defendants' collateral estoppel argument is not so obviously meritorious that it is clear, particularly to a *pro se* Plaintiff, that this action is barred by the Bankruptcy Court Order.[6]

Next, Defendants argue that Plaintiff's legal arguments violate Rule 11(b)(2), which requires claims, defenses, and other legal contentions to be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). They also argue that Plaintiff's factual contentions lack evidentiary support or are contradicted by the record in violation of Rules 11(b)(3) and (b)(4). First, it is uncontroverted that the Individual Defendants made a number of statements touting Warren's financial strength when the company's fiscal condition was in decline. Although such statements do not give rise to a securities violation, the Court cannot conclude that Plaintiff's filing of claims based on these statements was patently frivolous or unreasonable. Second, although Plaintiff misconstrued the Individual Defendants' statements about the acreage purchased in the Citrus Deal, the Court does not find that Plaintiff's allegations about those statements amount to sanctionable conduct, particularly in light of his *pro se* status. Accordingly, Defendants' motion for sanctions is DENIED.

---

[6] Because the Court has concluded that Plaintiff has failed to state a claim on which relief can be granted with respect to all of the claims in the Amended Complaint, it does not reach the merits of Defendants' argument that this action is collaterally estopped.

III.   Unserved Defendants

Rowland, BMO, BMO Capital, and Jefferies (the "Unserved Defendants") have not been served with process in this case, and did not, therefore, join the Moving Defendants' motion to dismiss.  The same grounds for dismissal of the Moving Defendants, however, warrant dismissal of the Amended Complaint as to the Unserved Defendants.  Accordingly, the Amended Complaint is DISMISSED with respect to the Unserved Defendants.  *See, e.g.*, *Johnson v. New York City*, No. 12 Civ. 4379, 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013) ("As the same conviction underlies plaintiff's claims against defendant Thomas Woods (who has not yet been served in this action), the Court dismisses the Complaint with respect to Woods *sua sponte*." ); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023, 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001) ("Although Unodotcom evidently has not been served and did not join in this motion, this order dismisses as to it on the same grounds, as precisely the same points control the claims against it.").

**CONCLUSION**

For the reasons stated above, the Moving Defendants' motion to dismiss is GRANTED, and their motion for sanctions is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 24 and 29 and close the case.

SO ORDERED.

Dated:  August 27, 2018
         New York, New York

_____
ANALISA TORRES
United States District Judge

20

PRIORITY MAIL
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

RECEIVED
SDNY DOCKET UNIT

2018 SEP 20  PM 4:03

**UNITED STATES POSTAL SERVICE.**

USM P3
SDNY

FROM: Morgan P. Cartwright
2347 N. 174th St.
Shoreline, WA 98133

TO:
U.S. District Court SDNY
Pro Se Intake Unit
500 Pearl St., Rm 200
New York, NY 10007

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

**PRIORITY®**

**UNITED STATES POSTAL SERVICE.**

Retail

**P**

US POSTAGE PAID
**$6.70**

Origin: 98133
Destination: 10007
0 Lb 5.40 Oz
Sep 18, 18
5478040006-8

1004

**PRIORITY MAIL 2-Day ®**

C014

EXPECTED DELIVERY DAY:  09/20/2018

USPS TRACKING NUMBER

9505 5141 7869 8261 2878 48

EP14F July 2013
OD: 12.5 x 9.5

PS00001000014